**AMERICAN HOIST & DERRICK CO., Appellant (C3–89–2241), Respondent (C3–90–57),**

v.

**EMPLOYERS' OF WAUSAU, Respondent,**

**The Minnesota Insurance Guaranty Association, Respondent (C3–89–2241), Appellant (C3–90–57).**

Nos. C3–89–2241, C3–90–57.

Court of Appeals of Minnesota.

April 24, 1990.
Review Denied June 26, 1990.

James R. Crassweller, Donald W. Niles, Doherty, Rumble & Butler, Professional Ass'n, St. Paul, for American Hoist & Derrick Co.

Lynn G. Truesdell, Charles E. Lundberg, Bassford, Heckt, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for Employers' of Wausau.

Dale M. Wagner, Louis J. Speltz, Moss and Barnett, Minneapolis, for The Minnesota Ins. Guar. Ass'n.

Considered and decided by CRIPPEN, P.J., and KALITOWSKI and MULALLY,* JJ.

## OPINION

EDWARD D. MULALLY, Judge.

American Hoist & Derrick (Amhoist) appeals from the trial court's determination that respondent Employers' of Wausau (Wausau), an excess insurer, has no obligation to provide "drop down" coverage at the levels of insurance occupied by two insolvent excess insurers. In appeal C3–90–57, appellant Minnesota Insurance Guaranty Association (MIGA) contends the trial court erroneously interpreted Wausau's policy language. The appeals of Amhoist and MIGA have been consolidated by this court.

## FACTS

Amhoist purchases multi-level product liability insurance to protect itself from lawsuits and other product liability contingencies. For the policy year beginning September 1, 1983 and running through September 1, 1984, Amhoist purchased the following products liability coverage from the listed insurers:

| COMPANY | COVERAGE |
|---|---|
| Coordinated Primary Coverage Level ($3 million) | |
| International | Coordinated primary coverage $3,000,000. |
| Twin City Fire | Coordinated primary coverage, $1 million part of $1.5 million excess of $1.5 million. |
| First Level Excess Coverage ($1 million) | |
| Central National | $1 million excess of primary. |
| Second Level Excess Coverage ($4 million) | |
| Integrity Ins. Co. | $4 million excess of first level excess. |
| Third Level Excess Coverage ($10 million) | |
| Mission National Ins. Co. | $10 million excess of second level excess. |
| Fourth Level Excess Coverage ($10 million) | |
| Employers of Wausau | $10 million excess of third level excess. |
| Fifth Level Excess Coverage ($125 million) | |
| Eleven separate companies | Total of $125 million excess of fourth level excess. |
| Sixth Level Excess Coverage ($50 million) | |
| Five separate companies | Total of $50 million excess of fifth level excess. |

In February of 1987, the third level excess coverage insurer, Mission National, became insolvent and was ordered into liquidation by a Los Angeles County Superior Court. In March of 1987, the second level excess coverage insurer, Integrity, also became insolvent and was ordered into liquidation by a New Jersey Superior Court. Amhoist has settled claims and is defending lawsuits that have reached the Integrity and Mission levels of excess insurance.

Because of the insolvency of Mission and Integrity, Amhoist submitted claims to Wausau, the fourth level excess coverage insurer. Amhoist demanded that Wausau provide its $10 million of coverage in excess of any coverage afforded by MIGA in lieu of the coverage which would have been

* Acting as judge of the Court of Appeals by appointment pursuant to Minn.Const. art. VI, § 2.

provided by Integrity and Mission. Wausau refused to provide this so-called "drop down" coverage.

The Wausau policy provided in part:
[Wausau] agrees with the insured as follows:

I. EXCESS LIABILITY INDEMNITY COVERAGE

The company shall indemnify the insured for loss sustained by the insured in excess of the underlying insurance in accordance with . the insurance agreements, exclusions and other terms and conditions of the immediate underlying policy.

\* \* \* \* \* \*

II. LIMITS OF LIABILITY

The company's liability under this policy is limited to the limits of the liability shown in the declarations. Said limits of liability apply in accordance with the limits of liability provisions of the immediate underlying policy.

\* \* \* \* \* \*

V. DEFINITIONS

When used in this policy \* \* \* "Loss" means the amount paid by or on behalf of the insured as damages in settlement of any claim or in satisfaction of any judgment for which the insured is legally liable on account of injury or damage to which the insurance under the immediate underlying policy applies or would apply but for the exhaustion of any applicable aggregate limits of liability, after deducting all recoveries and salvages, all other insurances (whether recoverable or not) other than the underlying insurance, and any other excess insurance purchased specifically to be in excess of this policy;

"Underlying insurance" means the insurance afforded by the policies designated in item four of the declarations, and any renewals and replacements thereof.

IV. Underlying Insurance:

$15 MILLION. EACH OCCURRENCE AND AGGREGATE (WHERE APPLICABLE) UMBRELLA LIABIL-

ITY PROVIDED BY THE CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, POLICY NO. CNU 00–29–59 ($1 MILLION), THE INTEGRITY INSURANCE COMPANY ($4 MILLION EXCESS OF $1 MILLION) AND THE MISSION INSURANCE COMPANY $10 MILLION EXCESS OF $5 MILLION, WHICH IS EXCESS OF SCHEDULED PRIMARY POLICIES OR SELF–INSURED RETENTIONS.

V. Limits of Liability:

$10 MILLION EACH OCCURRENCE AND AGGREGATE (WHERE APPLICABLE) IN EXCESS OF THE UNDERLYING INSURANCE STATED IN ITEM IV.

Amhoist brought a declaratory judgment action, seeking a determination that Wausau is required to "drop down" and provide coverage at the second and third levels of excess coverage, rather than the fourth. The trial court granted Wausau's motion for summary judgment, finding that the language of the policy did not require Wausau to "drop down" and provide insurance coverage at the Integrity and Mission levels of coverage. Amhoist appeals. The Minnesota Insurance Guaranty Association filed a separate appeal, contending the trial court erred in its interpretation of the phrase "insurance afforded by the underlying policies" as used in the Wausau policy. This court consolidated the appeals.

ISSUES

1. Did the trial court err in determining that Wausau is not required to provide "drop down" coverage?

2. Did the trial court err in determining that Wausau is not obligated to indemnify Amhoist until Amhoist's losses exceed $18,-000,000?

ANALYSIS

The trial court in the present case granted summary judgment. On review of a summary judgment, this court must determine whether there are any genuine issues of material fact and whether the trial court

erred in its application of the law. *Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979). The issues presented involve interpretation of an insurance policy. The interpretation and construction of an insurance policy is a question of law, which this court may review de novo on appeal. *See Iowa Kemper Insurance Co. v. Stone*, 269 N.W.2d 885, 887 (Minn.1978).

"Insurance policies are similar to other contracts; they are matters of agreement by the parties and the function of a court is to determine what the agreement was and enforce it." *Fillmore v. Iowa National Mutual Insurance Co.*, 344 N.W.2d 875, 877 (Minn.Ct.App.1984). In determining what the agreement was, the insurance policy

> must be construed according to the terms the parties have used, and the language used must be given its ordinary and usual meaning so as to give effect to the intention of the parties as it appears from the contract.

*Dairyland Insurance Co. v. Implement Dealers Insurance Co.*, 294 Minn. 236, 244–45, 199 N.W.2d 806, 811 (1972). Where there is no ambiguity in an insurance policy, there is no room for construction. *Id.* at 244, 199 N.W.2d at 811. In construing an insurance contract, the policy must be considered as a whole. *Henning Nelson Construction Co. v. Fireman's Fund American Life Insurance Co.*, 383 N.W.2d 645, 652 (Minn.1986).

It is clear that Wausau is an excess insurer. Excess insurers are generally liable only for the amount of loss or damage in excess of coverage provided by other insurance policies. *Seaway Port Authority of Duluth v. Midland Insurance Co.*, 430 N.W.2d 242, 247 (Minn.Ct.App.1988) (*SPAD*) (citing 16 G. Couch, R. Anderson and M. Rhodes, Couch on Insurance 2d, § 62.48 (1983)). As the *SPAD* court noted, some jurisdictions have required excess insurers to insure the full amount of loss in cases where primary insurers are insolvent and unable to pay. *SPAD*, 430 N.W.2d at 247. Amhoist identifies as grounds for requiring Wausau to provide "drop down" insurance, first, Amhoist's reasonable ex-

pectations regarding the scope of coverage provided by the Wausau policy; second, the language of the Wausau policy itself; and third, res judicata and collateral estoppel.

### 1. *Reasonable Expectations*

The doctrine of reasonable expectations was recognized by the Minnesota Supreme Court in *Atwater Creamery Company v. Western National Mutual Insurance Co.*, 366 N.W.2d 271 (Minn.1985). Under the doctrine of reasonable expectations, "the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." *Id.* at 277 (quoting Keeton, *Insurance Law Rights at Variance with Policy Provisions*, 83 Harv.L. Rev. 961, 967 (1970)). The supreme court has recently stated:

> The doctrine does not remove from the insured the responsibility to read the policy but at the same time does not hold the insured to an unreasonable level of understanding of the policy. Other factors to be considered are the presence of ambiguity, language which operates as a hidden exclusion, oral communications from the insurer explaining important but obscure conditions or exclusions, and whether the provisions in a contract are known by the public generally. In short, the doctrine asks whether the insured's expectation of coverage is reasonable given all the facts and circumstances.

*Hubred v. Control Data Corp.*, 442 N.W.2d 308, 311 (Minn.1989) (citations omitted).

Amhoist contends it would not have purchased excess insurance which did not provide "drop down" coverage in the event of the insolvency of one of the underlying insurers. As the *Atwater* court noted:

> The reasonable-expectations doctrine gives the court a standard by which to construe insurance contracts without having to rely on arbitrary rules which do not reflect real-life situations and without having to bend and stretch those

rules to do justice in individual cases * * * [T]he doctrine does not automatically remove from the insured a responsibility to read the policy. It does, however, recognize that in certain instances, * * * the insured should be held only to reasonable knowledge of the literal terms and conditions. The insured may show what actual expectations he or she had, but the fact finder should determine whether those expectations were reasonable under the circumstances.

*Atwater,* 366 N.W.2d at 278.

Numerous other jurisdictions have declined to require excess insurers to provide "drop down" coverage in the absence of an express agreement to do so, because of the difficulties this would cause for insurance companies:

The excess insurer's risk of loss is based on the assumption that a predetermined amount of primary coverage will be exhausted before the excess insurer must pay. Imposing primary coverage on the excess insurer would [transform] the excess policy into one guaranteeing the solvency of whatever primary insurer the insured might choose." Excess insurers are not required to scrutinize primary insurers financial stability before issuing policies or to guarantee that the insured's choice of primary carriers will always be sound.

*Steve D. Thompson Trucking, Inc. v. Twin City Fire Insurance Co.,* 832 F.2d 309, 311 (5th Cir.1987) (quoting *Continental Marble & Granite v. Canal Insurance Co.,* 785 F.2d 1258 (5th Cir.1986)), *quoted in SPAD,* 430 N.W.2d at 249–50.

■ Amhoist paid $50,000 for the Integrity policy, $42,500 for the Mission policy and $20,000 for the Wausau policy. It is difficult to see how Amhoist, a major industrial complex with experienced insurance personnel, could reasonably expect to pay a lower premium for a policy which insures the risk stated *and* the risk assumed by the underlying insurers.

### 2. The Wausau Policy Language

■ In the present case, as in *SPAD,* the insurance policy clearly states that "the company shall indemnify the insured for loss sustained by the insured in excess of the underlying insurance". The underlying insurance is defined as the insurance afforded by the policies designated in item 4 of the policy declarations. Item 4, in turn, describes the amount and policy number of each of the underlying policies. In addition, item 5 of the policy declarations states that Wausau's limit of liability is $10,000,000 in excess of the underlying insurance stated in item 4. Item 4 clearly establishes that there is $15,000,000 in underlying excess insurance before the Wausau level of insurance is reached.

MIGA argues that Wausau's definition of underlying insurance is ambiguous because it refers to the insurance "afforded" by the policies specified in item 4 of the declarations. MIGA argues that Integrity and Mission, being insolvent, "afford" no insurance, defining "afford" as meaning actually provide. MIGA cites no authority for this proposition.

In the alternative, MIGA argues that use of the phrase "insurance afforded by" at least creates an ambiguity which must be interpreted in favor of the insured. An insurance policy "must be construed according to the terms the parties have used, and the language used must be given its ordinary and usual meaning so as to give effect to the intention of the parties as it appears from the contract." *Dairyland Insurance,* 294 Minn. at 244–45, 199 N.W.2d at 811. Taken as a whole, the policy definition of underlying insurance unambiguously provides that Wausau would provide coverage of $10,000,000 excess over the first $15,000,000 in excess coverage.

### 3. Collateral Estoppel

■ Amhoist contends Wausau is precluded from denying coverage by the principles of res judicata and collateral estoppel. Collateral estoppel precludes the relitigation of issues previously litigated by a party in a prior action and necessary and essential to the resulting judgment. *Ellis v. Minneapolis Commission on Civil Rights,* 319 N.W.2d 702, 704 (Minn.1982).

There are four elements to collateral estoppel:

1. The issue must be identical to one in a prior adjudication;

2. There must be a final judgment on the merits;

3. The party against whom collateral estoppel is urged must have been a party or in privity with a party to the prior adjudication; and

4. The party against whom estoppel is urged must have been given a full and fair opportunity to be heard on the adjudicated issue.

*Ellis*, 319 N.W.2d at 704 (quoting *Victory Highway Village, Inc. v. Weaver*, 480 F.Supp. 71, 74 (D.Minn.1979)); *Clapper v. Budget Oil Co.*, 437 N.W.2d 722 (Minn.Ct. App.1989), *pet. for rev. denied* (Minn. June 9, 1989).

Amhoist contends Wausau is collaterally estopped from denying coverage based on a decision by the United States District Court for the Western District of Kentucky in *Whayne Supply Company, Inc. v. Employers Insurance of Wausau*, No. C 85–0843–L(B) (W.D.Ky., March 12, 1987) (order and memorandum). Wausau concedes that the third element of collateral estoppel is present. However, it disputes Amhoist's claim that the first, second and fourth elements are present.

The issue in *Whayne Supply* was whether language in a Wausau policy providing for coverage in excess of "the amount available * * * under all policies of underlying insurance" required "drop down coverage." It does not appear that the issues in the present case and in *Whayne Supply* are identical. The policy at issue in the present case uses the term "afforded," not the term "available" used in *Whayne Supply*.

In addition, the *Whayne Supply* litigation was settled by the parties. There was no final judgment on the merits. Thus, the second element of collateral estoppel is absent.

Because we have determined the first and second elements of collateral estoppel are not present, we do not reach Wausau's argument that it did not have a full and fair opportunity to be heard in the *Whayne Supply* litigation because the amount in controversy was only $17,000 and it did not have adequate incentive to pursue the question vigorously. *See* Restatement (Second) of Judgments, § 28 comment (1982).

MIGA argues the trial court erred in failing to hold that Wausau's coverage is primary to and offsets any coverage provided by MIGA. Because we determine that Wausau's insurance coverage does not drop down, we do not reach the priority issue.

## DECISION

 The Wausau policy does not provide "drop down" coverage under any of the theories advanced by Amhoist. MIGA's priority and offset argument is moot in light of our holding.

Affirmed.